UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

Sally S.[1],                                    )
                                               )
            Plaintiff,                          )
                                               )
     v.                                         )          CIVIL NO.  2:18cv460
                                               )
NANCY A. BERRYHILL, Acting                      )
Commissioner of Social Security,                )
                                               )
            Defendant.                          )

<u>OPINION AND ORDER</u>

        This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB), as provided for in the Social Security Act.  Section 205(g) of the Act

provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the

transcript of the record including the evidence upon which the findings and decision complained

of are based.  The court shall have the power to enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with

or without remanding the case for a rehearing."  It also provides, "[t]he findings of the

[Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42

U.S.C. §405(g).

        The law provides that an applicant for SSI must establish an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of no less than 12 months. . . ."

42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an

--------

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.    The claimant has not engaged in substantial gainful activity since April 13, 2013, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: degenerative disc disease, osteoarthritis, and left thumb dysfunction (20 CFR 404.1520(c)).

4.    The claimant does not have any impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant can occasionally climb ramps and stairs, but she must never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can frequently reach in all directions, including overhead, bilaterally. She can occasionally handle or finger with her left hand, and can frequently push and/or pull with her lower right extremity.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on March 8, 1963 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1564).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82041 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security act, from April 13, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12- 18 ).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on March 27, 2019. On May 8, 2019, the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on May 22, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff was born on March 8, 1963 (R.170). At the time of her alleged onset of disability , Plaintiff was 50 years old and "approaching advanced age." 20 C.F.R.§404.1563(d).

She has been married to her husband, Ed, for 35 years. *Id*. She graduated from high school and attended two years of college (R.190). Her past relevant work from October 1989 through April 2013 was as a Senior Beauty Advisor for Walgreens (Ex.190). She performed that job at the medium exertional level, being on her feet throughout the day and lifting/carrying up to 50 pounds (R.191,217-18). Vocational Expert (VE) Gusloff testified that the job, which he titled Department Manager per The Dictionary of Occupational Titles was a skilled job generally performed at the medium level of exertion (R.59).

In a function report from June 2015, Plaintiff explained that she's constantly changing positions because of discomfort in her back and right leg (R.201). The rheumatoid arthritis affects her sleep. *Id*. Her husband helps her putting on her shoes and socks. At times when she is having a bowel movement she gets a pain shooting down her right leg. *Id.* Her cooking has changed because she's not able to stand at the stove for long periods of time (R.202). She's stopped gardening due to back pain and arthritis (R.205). She specified that lifting was limited to 10-15 pounds, walking limited to 10-20 minutes, and standing limited to about 10 minutes. She's unable to squat or bend, and reaching is difficult. *Id*. In a report from Summer 2015, Plaintiff related that since July 2015 she'd been experiencing pelvic pain (R.210). In a report from August 31, 2015, Plaintiff explained that her son and daughter help with household chores and car maintenance (R.226). She reiterated that standing in the same positions causes back pain (R.227). Plaintiff noted that lifting/carrying was now limited to 5-10 pounds, she can't stand longer than 10-20 minutes in one spot, reaching is limited, sitting is limited, and walking is limited to 5-10 minutes (R.230). She's developed anxieties and claustrophobia (R.231). In a disability report from October 2015, Plaintiff listed her prescribed medication as:

Cyclobenzaprine, Depo-Medrol injection, Diclofenac Sodium, Kenalog, Meloxicam, and Tramadol (R.241). She also takes over the counter Advil and Tylenol. *Id*.

An MRI of Plaintiff's lumbar spine performed on May 31, 2012, showed central disc herniation at T12-L11, and degenerative disc disease at L4-L5 and L5-S1 (R.277). Dr. Dasari's impression was of right lumbar radicular pain, degenerative disc disease L5-S1, and foraminal stenosis L5-S1. *Id*. She's had a four month history of persistent back pain radiating down her right leg. She was off work because of the pain and had been referred for epidural steroid injections. *Id*. On June 18, 2012, Dr. McComis had diagnosed low back pain and a herniated lumbar disc (R.280). He recommended an epidural steroid injection, physical therapy and sedentary work limitations (R.281).

On August 2, 2012, Plaintiff related to Dr. McComis that she had 50% relief from the epidural injection and three weeks of therapy but she continues to have buttock and thigh pain (R.282). Bending over causes most of her pain and she has problems standing as well as getting in/out of a car. *Id*. On August 23, 2012, Dr. Dasari administered a right L5 and S1 transforaminal epidural steroid injection under fluoroscopy and epiduragram (R.270). The diagnosis was lumbar degenerative disc disease and radiculitis. *Id*. Her previous steroid injection had been on July 19, 2012, and she'd experienced 50-75% pain relief with the injection (R.272). The pain in her low back and right leg is less frequent but of the same intensity as before. She rated her daily pain at 4/10, said she modifies her daily activities and chooses which ones to complete. *Id*. On September 13, 2012, Plaintiff told Dr. McComis that she's been doing better since the last injection but she still feels a heaviness in her right hip and leg and she had been dragging her leg. (R.285). Dr. McComis gave her a 20-pound weight restriction and noted that if she wasn't better

in two months they should consider a right L5-S1 microlumbar discectomy (R.286).

On November 8, 2012, Plaintiff reported right buttock pain going down to her calf (R.288). She had been working but having problems with ladders and steps. *Id*. Dr. McComis recommended surgery (R.289). On December 13, 2012, Plaintiff related that the pain has been more aggravating over the last week and she's not able to do any extension exercises at therapy because they increase her pain dramatically (R.291). She said that Dr. Singh told her that if she failed physical therapy she should have surgery. *Id*. On examination she was tender across the lumbosacral junction and extension of 15º caused discomfort (R.292).

On May 1, 2013, Plaintiff's worker's compensation carrier authorized Dr. Singh to perform an L5-S1 laminectomy, posterior spinal fusion with instrumentation and interbody cage placement (R.509). The surgery was performed on May 24, 2013 at Rush University Medical Center (R.492-94). Dr. Singh noted pre-operatively that Plaintiff had intractable low back pain radiating to the right buttock and posterior thigh. *Id*. The post-op diagnosis was degenerative disc disease L5-S1 and spinal stenosis L5-S1 (R.492). Four weeks after the surgery her leg pain had improved but she was still having numbness and tingling in both legs (R.480). In July 2013 Plaintiff related that she'd been doing physical therapy and over the past few days had increased pain radiating down the right posterior aspect of her leg. She was taking Tramadol with minimal relief (R.478). In August 2013, Plaintiff related occasional dull aching in her low back and an intermittent throbbing sensation radiating down the right lateral aspect of her leg. Dr. Singh advised that she could return to work with a 5 pound weight limit (R.475-76). At that time Plaintiff reported an inability to stand for more than a ½ an hour (R.417). In September 2013, Dr. Singh recommended less than 5 pounds of lifting, pushing or pulling (R.473). She had been

taking Mobic for pain. *Id.* She reported feeling worse and that the pain was better with lying down and leg elevation (R.411). In October 2013, Plaintiff was still relating a dull ache in her low back with shooting pains into the posterior right leg (R.469). She has good and bad days and pain is better with lying down (R.395). She can stand 15 minutes at a time. *Id*. A work conditioning progress note from December 6, 2013, limited Plaintiff's lifting to 15 pounds but her carrying to only 10 pounds (R.318). Dr. Singh reported that Plaintiff would continue with a 5 pound weight limit (R.467). She was having dull, cramping back pain that goes into both buttocks (R.466).

A work-conditioning progress note from January 14, 2014, reflects a diagnosis of spinal stenosis/L5-S1 fusion (R.310). At that time Plaintiff was considered to be at the light level, although she was limited to only 5 pounds of lifting overhead (and only occasionally) (R.314-15). On January 15, 2014, Plaintiff told Dr. Singh that she was better than she had been before the surgery with her axial back pain at 3/10 (R.463). The pain gets worse with lifting, carrying and bending. *Id*.

March 26, 2014, treatment notes from Dr. Bhargava reflect joint pain and fatigue (R.551-52). She had come in on that date for an earache and headache. On May 8, 2014, Plaintiff was seen by Dr. Kevin Joyce (R.532). She related worsening joint pain and stiffness and she had a positive ANA. *Id*. The ANA test was done during a work-up for musculoskeletal complaints. For the past couple of months she had some degree of pain at the shoulders, hands, wrists and elbows. There was increased achiness for about 30 minutes in the morning. She also reported "what sounds like" triggering at the 4th and 5th digits bilaterally (R.532). She related fatigue. There was diffuse joint pain on examination. *Id*. Dr. Joyce reported subtle osteoarthritic changes in the claimant's hands and there was a small degree of crepitus but no impingement at her

shoulders (R.534). There was also slight crepitus in her knees. *Id.* The assessment was of elevated antibody levels; arthralgia of multiple sites; osteoarthritis; acquired trigger finger; and fatigue. *Id*.

On May 7, 2015, Plaintiff was seen by Dr. Sital Bhargava with complaints of lower, left-sided back pain (R.547). The pain radiates to wrap around her hips. Bending makes it worse. There was pain with flexion and lateral bending. *Id*. Dr. Bhargava diagnosed a lumbar sprain/ strain and muscle spasm. *Id*. She was given a steroid injection, started on a muscle relaxant and prescribed Diclofenac for the pain (R.548).

On June 26, 2015, Plaintiff was examined by Adela M. Perez, M.D., at the behest of SSA (R.632-35). Plaintiff related back pain radiating to her right leg and knee (R.632). There was also numbness and tingling, pain with an antalgic walk and dragging of the right leg. The pain was worse with bending. It was noted that she had been diagnosed with rheumatoid arthritis. The pain was at about 7/10, everyday. Rest with a pillow between her legs helps. Plaintiff experiences migraine headaches when her back/leg pain is at its worst (about once every two weeks). With bowel movements the pain shoots down her right leg and she's unable to stand more than 10 minutes. Sitting longer than 20 minutes causes back pain. She can walk 15 minutes and lift/carry 8-10 pounds. *Id*. When doing the above activities the pain goes up to 8-10/10. She related arthritic symptoms in her hands, wrists, fingers, ankles, shoulders, elbows and back. The arthritic pain is worse in the morning and it takes her about 30 minutes to relieve the stiffness, especially in her hands and fingers (R.632). Neurologically she has neuropathic right leg pain and migraine headaches (R.633). On examination Plaintiff had tenderness to palpation in her hands and fingers (R.634). She has Heberden's nodes and Bouchard's nodes on her hands. There was lumbar spine

tenderness and paraspinal tenderness with muscle spasms and flexion reduced by 30% to 60º (R.634). She had an antalgic gait but otherwise the neurologic exam was negative. *Id.* The diagnosis was painful lumbar spine, post-surgery; antalgic gait; degenerative disc disease; rheumatoid arthritis; migraine headaches; and pain in all joints without range of motion abnormalities7 (R.635).

On November 3, 2016, Plaintiff saw Dr. John F. Fernandez (R.652-55). She was referred by Dr. Panio for ongoing problems of her left thumb and hand related to an attack from her neighbor's dog on April 23, 2016 (R.652). After the initial injury she developed residual pain, swelling and loss of motion. She had several weeks of therapy and courses of antibiotics. She had MRIs and underwent surgery including a tenosynovectomy and synovectomy of the IPJ and MPJ of the thumb at both the PJ and MPJ levels. That surgery was performed by Dr. Panio on August 16, 2016. She had been in therapy for the past 2½ months (R.652). She related that the pain ranges from 2-9/10 depending on her activities. "She is complaining of stiffness involving the IPJ greater than the MPJ with dorsal radial sensory numbness, tingling and cold sensitivity with weakness. She also has some cords and nodules she is developing in the palm." *Id.* Dr. Fernandez reported that, "I felt that her subjective complaints correlated very well with the objective findings." (R.653). Neurologically, there were some paresthesias in the dorsal radial sensory nerve distribution along the thumb dorsally, but no deficits in the median distribution distally. There were indications of local neuroma, dorsal radial, the dorsal thumb including the MPJ and IPJ region. *Id.* There was weakness to pinch and grip of about 50% loss compared to the contralateral side. Musculoskeletal inspection showed thickening at the IPJ and MPJ level. *Id.* There was pain to direct palpation, particularly at the IPJ with any attempts of motion

including the MPJ on flexion. *Id*. There was significant stiffness with essentially arthrofibrosis of the IPJ in a neutral position with no effective motion to extension or flexion (R.654). MPJ motion was limited to 40º of flexion compared with 70º on the contralateral side with extensor lag of 20º compared to +20 on the contralateral side. *Id*. Dr. Fernandez's active diagnoses were: left thumb stiffness, severe, loss of the radial condyle; left thumb MPJ stiffness to flexion; left hand Dupuytren's disease without contracture; and left thumb dorsal radial sensory neuritis/ neuroma (R.654). Dr. Fernandez reported that it was increasingly obvious that she will likely require additional surgery, noting a capsulectomy release of the MPJ with local tenolysis and possibly similar attempt to the IPJ level. The main risk is recurrence, relapse or failure. *Id*. The earliest he would recommend the surgery would be February 2017. (R.654-55). Physical therapy records from November 9, 2016, show Plaintiff continuing to complain of pain as well as inability to move her thumb, especially the tip and lack of motion (R.693). During activity, including cutting food and general use Plaintiff's pain increases to 7-8/10. *Id*. Functional limitations include things like holding a plate, opening doors, and writing or doing paperwork tasks. *Id*. On December 15, 2016, Plaintiff saw Dr. Panio and told him that she was going to leave things as is for the time being (R.656).

On April 3, 2017, Plaintiff related to Dr. Ralph Richter, at the hand center of St. Catherine's Hospital, that she was still having problems with her thumb (R.673). There was tingling in the thumb and pain down into the MCPJ. Range of motion was still limited and she was affected by the cold. *Id*. Dr. Richter noted that he doubted there would be any further improvement. Dr. Richter reported, "no movement at IP joint, ankylosed at about 10º flexion. *Id*.

At the hearing before the ALJ, Plaintiff testified that she was 54 years old (R.37). She

described her back injury, treatment with injections and eventual surgery including a fusion (R.39-40). There was some post-surgical improvement but her back continues to be a problem (R.39-40). The pain continues to be in her low back toward the right (R.41). The pain mostly stays in her back but may wrap around "to like half my hip." *Id.* The pain will sometimes go down her right leg to the knee, where it bends. *Id*. She described it as a shooting nerve pain. Because of the pain she was unable to sit on the floor to try to play with her grandchildren and it's nearly impossible for her to hold them. The grandchildren are 1 and almost twelve months old.

Plaintiff testified that she has problems using the restroom. *Id.* When she has a bowel movement the pain shoots down the right side of her leg to the knee and she has difficulty just lowering herself to the toilet (R.42). She noted the shooting pain to be at a level of 6-7/10.

She also has problems with her left hand and she's left handed (R.42). When she was attacked by the neighbor's dog it did damage to the top of her knuckle so that it no longer bends. It has no movement. She also related a tingling or "weird" sensation. *Id*. Plaintiff explained that she has scar tissue wrapping around the back of her thumb that prevents her from moving the thumb towards her palm (R.43). She also has a nodule on the middle portion of the back thumb that protrudes and causes pain when touched. *Id*. Her left hand grip isn't good, it's difficult to even grip a cup of coffee (R.44). She explained, "If it's something wide I can't spread my hand wide enough to do it. If it's something small it rests on that nodule. It makes it very difficult." (R.44). She's dropped things. *Id*. She estimated that the heaviest thing she could lift would be five or six pounds and that would be mostly with her right hand, not her left. *Id.*

When she wakes up in the morning she has stiffness in her low back that lasts for maybe 30 minutes. She's unable to garden anymore. *Id*. She's unable to use her left hand properly

(R.45). Plaintiff testified that she gets headaches at least every other day when her pain is really bad. *Id*. She takes Tylenol for the headaches and if it works the headache lasts for two hours. *Id*. The pain/strange feeling in her thumb is constant and it's constantly on her mind (R.46). Regarding her back pain the doctors have told her that she's as good as she's going to get. *Id*. That's why she hasn't gotten any additional treatment. She has difficulty reaching forward and problems using a keyboard because of her left hand and thumb. *Id*.

When asked if she'd be able to perform a full-time, unskilled inspector job, Plaintiff explained that she could not because of the pain in her back with regard to sitting and standing and because of her left hand (R.46-47). During a typical day Plaintiff will lie down about five times to rest with a pillow propped between her legs (R.47). "It kind of takes the pressure off." *Id*. She didn't think she'd be able to get through an 8-hour period of time without lying down. *Id*. She added that although she can lie down to help with her back pain there's no break from the pain in her hand (R.47).

Plaintiff testified that she lives with her husband and that they have a dog (R.51). She occasionally walks the dog and will fill his water bowl. *Id*. She added that the dog is 12-years old and pretty docile (R.52). Some days she's unable to walk the dog because her back is bothering her (R.56). That happens at least three times a week. *Id.* She is able to take care of her personal needs but sometimes her husband has to tie her shoes (R.52). She drives, sometimes to visit her children who both live just 10 minutes away. *Id*. She visits her daughter, who is a bit closer, maybe twice a week and her son maybe once every three weeks. *Id*. The two grandchildren are split between her children (R.53).

Plaintiff stated that she may shop for groceries every two weeks at a grocery store five

minutes from her home. *Id*. She shops from a list and her shopping takes 15-20 minutes (R.53-54). She goes to the grocery store with her husband who does all of the lifting (R.56-57). Other than visiting with her children and grandchildren she doesn't really attend any social events and she uses her computer mostly to check her bank account (R.54). When she does so she's generally on the computer for maybe ten minutes (R.57).

Describing a typical day Plaintiff stated that she doesn't sleep well so she gets up early (R.55). She explained that she doesn't do much. She'll check to see if they need groceries, sit down, watch some television, and make a light dinner which she normally eats with her husband. *Id.* Cooking a light dinner means she's standing 10-15 minutes at a time (R.57). Cutting vegetables is a problem because of her left hand. Sometimes she improvises, other times she'll ask her husband to do it. I*d*. She explained that she has had to even change the way she uses a door knob to open a door because of the nodule and scar tissue in her left thumb/hand. *Id*. When the nodule gets touched, "[i]t's like a sharp pain, very tender, very tender." (R.58). She reiterated that she's left-handed.

*Id*.

When asked by the ALJ to consider an individual limited in the manner set forth by the State agency non-examining reviewers (i.e., light work with the ability to occasionally climb ramps/stairs, no ability to climb ladders, ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch and crawl), the vocational expert (VE) testified that such an individual could not perform Plaintiff's past relevant work (R.60-61). The VE testified that such an individual had skills from Plaintiff's past work to transfer to the job of sales clerk (R.61). The VE testified that other jobs conforming to that hypothetical were marker, cafeteria attendant, and linen grader

(R.61-62). The ability to use the left arm/hand, or both hands frequently for reaching, including overhead reaching, wouldn't change the VE's testimony, nor would frequent handling and fingering with the left hand (R.62). However, if handling and fingering with the left hand could only be done occasionally the jobs previously named would be eliminated (R.62-63). When asked to name jobs the hypothetical individual limited to only occasional handling and fingering with the left hand could perform, the VE named investigator, dealer accounts (70,000 in the United States); counter clerk (40,000 in the United States); and school bus monitor (30,000 in the United States)(R.63). The VE testified that Plaintiff does not have any acquired job skills that transfer to the sedentary level (R.63). At the sedentary level the Commissioner's Grid Rules would apply [to direct a finding of disabled], noting rule 201.14 (R.64-65). If the individual were off-task 20% of the work day competitive employment would be precluded (R.65-66). In addition, if the individual were absent from the workplace two or more days per month work would be precluded (R.66). If the individual has to take unscheduled breaks 10-15% of the work day, it wouldn't be tolerated by an employer (R.67). So that if an individual, on a regular basis, as often as twice a day, had to take unscheduled breaks, it would effectively preclude competitive employment (R.67). If the individual is limited to standing/walking no more than two hours in an eight-hour work-day the individual cannot sustain the demands of unskilled light work (R.68). The VE stated, "Most of your light jobs are going to be time on your feet well above two hours per day." *Id.*

In support of remand, Plaintiff first argues that the ALJ erred in finding Plaintiff capable of performing light work. The ALJ found that Plaintiff could perform the essential demands of light work (R.13). Light work requires lifting/carrying up to 20 pounds for one-third of the work

15

day. It also requires the individual to be on her feet for the majority of the workday (R.68). Plaintiff contends that these requirements are incompatible with the records of Plaintiff's treating physicians and that the ALJ erred in failing to fully and fairly consider the evidence of record.

On May 24, 2013, Dr. Singh performed an L5-S1 laminectomy, posterior spinal fusion with instrumentation and interbody cage placement (R.492-94). In August 2013, Plaintiff related occasional dull aching in her low back and an intermittent throbbing sensation radiating down the right lateral aspect of her leg. Dr. Singh advised that she could return to work with a 5 pound weight limit (R.475-76). At that time Plaintiff reported an inability to stand for more than a 30 minutes (R.417). In September 2013, Dr. Singh recommended less than 5 pounds of lifting, pushing or pulling (R.473). In December 2013, Dr. Singh reported that the claimant would continue with a 5 pound weight limit (R.467). Although in January 2014 she was cleared for light duty it was with no more than 5 pounds overhead (R.314-15), and by early May 2014, Dr. Joyce's records reflect worsening joint pain and stiffness with a positive ANA (R.532). For the past couple of months she had some degree of pain at the shoulders, hands, wrists and elbows. There had been increased achiness for about 30 minutes in the morning. There was also triggering at the 4th and 5th digits bilaterally (R.532). Fatigue was noted along with diffuse joint pain on examination. *Id.* The assessment was of elevated antibody levels; arthralgia of multiple sites; osteoarthritis; acquired trigger finger; and fatigue (R.534).

On May 7, 2015, Plaintiff was given a steroid injection, started on a muscle relaxant and prescribed Diclofenac for the pain (R.548). On June 26, 2015, Plaintiff reported to Dr. Perez that and she's unable to stand more than 10 minutes, walk more than 15 minutes or lift/carry more than 8-10 pounds (R.632) She related arthritic symptoms in her hands, wrists, fingers, ankles,

shoulders, elbows and back. The arthritic pain is worse in the morning and it takes her about 30 minutes to relieve the stiffness, especially in her hands and fingers (R.632). Neurologically neuropathic right leg pain was identified (R.633). On examination she had lumbar spine tenderness and paraspinal tenderness with muscle spasms and flexion reduced by 30% to 60º. She also had an antalgic gait (R.634).

Then, four months after being attacked by a neighbor's dog in April 2016, Plaintiff underwent a tenosynovectomy and synovectomy of the IPJ and MPJ of the thumb at both the PJ and MPJ levels by Dr. Panio (R.660). The surgery was followed by more than two months of therapy (R.652). In November 2016, Dr. Fernandez reported that Plaintiff's subjective complaints of residual pain, swelling and loss of motion of her left thumb correlated very well with the objective findings (R.653). Dr. Fernandez reported that it was increasingly obvious that she would need more surgery (R.654). In April 2017, Dr. Richter reported tingling in the thumb and pain down into the MCPJ; range of motion was still limited and she's affected by the cold; Dr. Richter noted that he doubted there would be any further improvement and reported, "no movement at IP joint, ankylosed at about 10º flexion (R.673).

Plaintiff argues that the ALJ failed to provide a well-supported and logical rationale in support of her finding that Plaintiff could sustain the essential demands of light work. Plaintiff contends that the ALJ's rationale for finding that Plaintiff could lift/carry 20 pounds for up to one third of the workday is not supported by substantial evidence. Plaintiff also asserts that the ALJ failed to consider Plaintiff's impairments in combination. The ALJ "must consider the aggregate effect of this entire constellation of ailments . including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citing 20 C.F.R.§

404.1523).

In the present case, the ALJ indicated that Plaintiff's degenerative disc disease was somewhat improved by the fusion; that the osteoarthritis with a positive ANA had little impact; and that there were only minor changes to her thumb without continued signs of infection and as a result discounted the severity of Plaintiff's impairments and their resulting functional limitations (R.16).

Plaintiff also asserts that the ALJ committed additional error in her reliance on the assessments of the non-examining State agency reviewing doctors. The ALJ says she gave "some" weight to the non-examining reviewing Agency physicians, stating that their opinions are "generally consistent with the medical evidence of record," but implying that she did not totally rely on those opinions because she added some limitations that the VE said would not prevent work (R.16). One of the more troubling aspects of the ALJ's reliance on the opinions of the non-examining State agency reviewers, particularly with regard to Plaintiff's ability to lift, carry, stand, and walk throughout the workday, is that the State agency reviewers considered no evidence received after September 9, 2015 (R.82-83). In other words, the Agency reviewers' opinion which the ALJ accorded "some" weight (and in fact adopted the opinion vis-à-vis lifting/carrying/standing and walking), was based on less than all of the evidence. The exhibits submitted at the hearing level substantiate extreme limitations on Plaintiff's dominant left upper extremity and support not just reaching limitations but also lifting and carrying limitations because they're superimposed on an individual with a history of a lumbar fusion and ANA positive arthritis affecting her shoulders, hands wrists and elbows (*see e.g.*, R.532).

In support of the ALJ's RFC finding, the Commissioner states that the ALJ "[o]bserved

that Plaintiff's physical examination was essentially normal during the September 2013 office visit," citing to the ALJ's decision noting page 472 of the Administrative Record (Defendant's Brief ["Def.Br."] at p.7). Page 472 reflects notes from Dr. Singh about four months after Plaintiff's laminectomy (R.472). Plaintiff related that she was significantly better than prior to the surgery but she still has a dull ache in her low back and an intermittent throbbing sensation down the right lateral aspect of her leg. *Id*. Dr. Singh's recommendation was for lifting "less than 5 pounds," and for minimal bending, kneeling, stooping, and squatting (R.473). The Commissioner argues that the ALJ considered Dr. Singh's recommendation from January 14, 2014, stating that the ALJ's RFC finding is consistent with Dr. Singh's recommendation (Def.Br. at p.7, citing R.463-64). As Plaintiff notes, the Commissioner's argument is wrong. Although Dr. Singh used the term "light" because that is the term used by the evaluator (R.310); it is not "light" as that term is recognized by SSA. The ability to perform at the light level for purposes of SSA requires the ability to both lift and carry up to 20 pounds. 20 C.F.R. §1567(b). The evaluation demonstrated that as of January 2014, Plaintiff could carry only up to 15 pounds with both hands (R.310). An inability to carry up to 20 pounds means that Plaintiff was not at the light level of exertion but rather, the sedentary level.

The Commissioner notes the treatment Plaintiff received with regard to her left thumb/hand as a result of the dog bite then notes that the ALJ accorded some weight to the State Agency reviewers who opined that Plaintiff could perform light work without having had any opportunity to review the records regarding Plaintiff's left thumb and hand. (Def.Br. at p.8). The Commissioner then argues that by adding that Plaintiff could only occasionally handle or finger with her left hand the ALJ adequately accounted for the injury to Plaintiff's dominant left hand.

19

(Def.Br. at p.8). Again, however, the Commissioner's argument is wrong. Plaintiff is left handed and the injury to her left hand did more than affect her ability to handle and finger. Plaintiff told Dr. Fernandez that her left hand pain ranges from 2-9/10 depending on her activities. "She is complaining of stiffness involving the IPJ greater than the MPJ with dorsal radial sensory numbness, tingling and cold sensitivity with weakness. She also has some cords and nodules she is developing in the palm." *Id*. Dr. Fernandez reported that, "I felt that her subjective complaints correlated very well with the objective findings." (R.653). Neurologically, there were some paresthesias in the dorsal radial sensory nerve distribution along the thumb dorsally, but no deficits in the median distribution distally. There were indications of local neuroma, dorsal radial, the dorsal thumb including the MPJ and IPJ region. *Id*. The painful palm nodules on her dominant left hand interfere with her ability to use that hand for lifting and carrying. There is nothing in the ALJ's decision that shows otherwise. The additional challenge to lifting and carrying needed to be considered by the ALJ, but it was not and the ALJ's finding that Plaintiff could sustain the lifting and carrying demands of light work is not supported by substantial evidence. Accordingly, remand is appropriate on this issue.

Next, Plaintiff argues that the ALJ's credibility determination is patently wrong and not supported by the record. The ALJ states that Plaintiff's statements concerning the intensity, persistence and limiting effects of her impairments are not "entirely consistent," with the medical and other evidence of record (R.14). Case law holds that testimony cannot be rejected simply because it is not fully corroborated by objective medical evidence. *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir, 2014). The fact that an individual's statements are not "entirely consistent with the medical and other evidence," is not a

valid reason to find against a claimant's credibility. In *Hill v. Colvin*, 807 F.3d 862, 867 (7th Cir. 2015), the Court referred to this language as "boiler plate." In *Hill*, the Court found the ALJ's credibility finding to be flawed in several respects. The ALJ found against Anne Hill's credibility because she had stopped taking narcotic pain medication and had complained to doctors about her back pain only intermittently. The Seventh Circuit pointed out that the ALJ ignored the explanations, contrary to *Beardlsey v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014)(remanding where the ALJ made no attempt to determine a reason for the conservative treatment). Here, Plaintiff explained that she had been told that there was really no more that could be done for her back (R.46), and Plaintiff argues that the ALJ erred in failing to explain why she did not consider that fact in assessing Plaintiff's credibility.

Plaintiff did experience some improvement in the leg pain following her the surgery but she still had numbness and tingling in both legs (R.480). Moreover, within a couple months of Dr. Singh releasing her to light lifting, Dr. Joyce noted worsening joint pain and stiffness with a positive ANA and fatigue (R.532). The ALJ dismisses these arthritic impairments saying they were treated with only an Omega 3 supplement (R.16). However, the record shows that Plaintiff was also treated with steroid injections and prescribed Diclofenac and Cyclobenzaprine (10 mg. up to three times a day); Meloxicam and Tylenol Arthritis Pain 650 mg. (R.533,548). Thus, although Dr. Joyce added the Omega 3 Supplement (R.535), that wasn't the only "treatment" she received for the ANA positive arthritis. In fact, in the same note where the Omega 3 supplement was discussed, Dr. Joyce also noted a score of 99205/99245, indicating a high risk of acute or chronic illness that may pose risk to life or bodily function (R.535). Thus, the ALJ's finding against Plaintiff's credibility on the basis that the severity of her impairments is belied by the

evidence of record is not supported by substantial evidence.

The ALJ also discounts limitations on Plaintiff's functional capacity on the basis of her activities, noting that a function report from August 2015 reflected that Plaintiff was independent in personal care activities; could prepare simple meals; do light housekeeping; had difficulty with the weight of her year-old grandchild; was able to walk her dog; and could drive and shop (R.16). Plaintiff notes, however, that even as listed by the ALJ there is nothing in these activities that is contrary to an inability to lift/carry more than 5-6 pounds on an ongoing basis throughout the workday. Moreover, in that same function report that the ALJ credits, Plaintiff states that lifting/carrying is limited to "5-10" pounds (R.230). When considering a claimant's activities the ALJ must look at the actual manner in which activities are carried out. *Rousey v. Heckler*, 771 F.2d 1065, 1070 (7th Cir. 1985). Here, Plaintiff explained that she carried out her activities without lifting over 10 pounds, standing no more than 10-20 minutes at a time, and that her ability to reach is limited (R.230). Clearly, it was legal error for the ALJ to cherry-pick Plaintiff's function report.

The Commissioner argues that the ALJ's finding that Plaintiff's "limitations were not as severe as alleged" was an adequate credibility assessment. (Def.Br. at 10). However, it is clear that in considering the limitations from Plaintiff's back impairment, the ALJ erred in failing to recognize that Plaintiff had been told by her doctors that there was really nothing more they could do for her (R.46). As noted above, the ALJ's review of Plaintiff's activities also failed to support her credibility finding. Thus remand is warranted on this issue also.

Lastly, Plaintiff argues that the ALJ's Step 5 finding is not supported by substantial evidence.   The ALJ found that Plaintiff cannot perform any past relevant work but

concluded at Step 5 that she was not disabled on the basis that she could perform the jobs of investigator, dealer accounts (70,000 jobs); counter clerk (40,000 jobs); and school bus monitor (30,000 jobs)(R.17-18). Plaintiff points out that 65.5% of school bus monitors are not full-time jobs and as such, leaves only 10,350 school bus monitor jobs. Plaintiff also asserts that the VE's testimony, on which the ALJ relied, did not provide a significant number of jobs that Plaintiff could perform. The total number of jobs named by the VE amounts to only 120,350 in the entire country. It is the Commissioner's burden to come forward with a significant number of jobs this Plaintiff can perform existing in the economy. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). Plaintiff informs the court that he total number of full time jobs in the United States is 150,606,000. Thus, the named jobs amount to only 0.080% of existing national jobs. Plaintiff contends that in coming forward with only 0.080% of jobs the Commissioner has failed to meet her step five burden of coming forward with substantial evidence of a significant number of jobs Plaintiff can perform.

In response, the Commissioner cites to cases where she states that far less jobs were found to be significant. (Def.Br. at 1). The problem with this argument is that none of the cases cited reflect national numbers. It has been the Commissioner's choice to focus on national numbers rather than local numbers and there is no authority stating that 120,350 jobs in the entire United States constitutes a significant number. The Commissioner cites no Seventh Circuit cases nor any cases from the last 25 years. At step 5 of the Commissioner's sequential evaluation it is the Commissioner's burden to come forward with substantial evidence of a significant number of jobs the individual can actually perform. SSA had made clear that the jobs don't actually have to be available in the sense that there are job openings nor does the agency have to consider whether,

if the claimant applied for said job they would actually be hired; but if SSA is going to deny benefits on the basis that "a significant number" of jobs exists that this individual could theoretically perform, the agency should actually be held to show by substantial evidence that a true significant number exists. This court agrees with Plaintiff that 120,350 jobs in the entire nation (0.080% of jobs) is not a significant number on which to deny disability benefits.

Accordingly, for all the foregoing reasons, this case will be remanded back to the Agency.

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

Entered: July 23, 2019.

s/ William C.  Lee
William C. Lee, Judge
United States District Court